MARY E. SHAW, plaintiff in error, *vs.* THOMAS WYLDS, defendant in error.

Where the verdict is one which should have been rendered under the evidence, and no error was committed against the complaining party during the trial, it is error in the court to set it aside and grant a new trial on the ground that the verdict was without evidence to sustain it.

New trial. Before Judge GIBSON. Richmond Superior Court. October Term, 1873.

Charlotte Bugg died testate, with the following provisions of her will of force :

"*Item.* I give and bequeath to my grand-daughter, Mary Shaw, the daughter of Tilman Shaw, formerly of said county, and my daughter, Melvine, deceased, now a pupil at the Dower Institute school, South Carolina, the sum of five hundred dollars, ($500 00,) the same to be held in trust for her by my son-in-law, the said Thomas Wylds, whom I direct to loan out the same to the best advantage, paying over to her, or towards her board and clothing, annually, the interest accruing upon said amount, and in case she should marry, with the written consent and approbation of her said trustee, then and in that event it is my will and desire that he do pay over to her the principal sum held by him in trust as aforesaid.

"*Item.* I give and bequeath unto my grand-son, Edmond Shaw, the brother of the aforesaid Mary Shaw, the sum of three hundred dollars, ($300 00,) upon the following terms and conditions, the same to be held in trust for him by my said son-in-law, the said Thomas Wylds, who shall pay over to him, or towards his board and clothing, the annual interest accruing upon said principal sum until the said Edmond arrives at the age of twenty-one years, when it is my will that he do receive, as his own property, the said principal held in trust as aforesaid, until which time it is my further will and desire that the said trustee do loan out said principal upon good and undoubted security."

Thomas Wylds qualified as executor, and received, as trustee, the legacy for Mary Shaw, January 19, 1856. On the

first of July, 1864, he settled with and took her receipt as follows, but has paid her nothing since :

> "JULY 1ST, 1864.
>
> "Received of Mr. Thomas Wylds the interest of two hundred and and thirty-seven dollars and half in full.
>
>     (Signed)                 "MARY SHAW."

On the 31st of December, 1869, she instituted suit for interest from July 1, 1864, to January 1, 1870, $210 00. The defendant pleaded the general issue and payment.

The plaintiff offered the extract from the will and defendant's admission of the receipt of the legacy, and his failure to pay the interest thereon since July 1st, 1864.

Defendant offered his own testimony as follows : I got possession of the $500 00 of Mary Shaw on the 19th January, 1856, and I lent it out first on interest in 1858. Mary Shaw became of age in 1862. I paid her up the interest to the 1st July, 1864. The last time, I lent it to Simeon A. Atkinson. He applied to me to lend him money. I told him I had no money of my own, but I had some belonging to others at my command, but that it must be well secured. He promised to give General A. R. Wright and Judge Gibson as security. General Wright was then a planter in Jefferson and was perfectly good. I went to see my lawyer, Judge McLaws, who drew the will, about it, and he told me General Wright was good and I could safely lend Mary Shaw's money on his security. I then lent it to him on the 7th January, 1861. I took Atkinson's note, indorsed by General A. R. Wright, for $700 00—$500 00 of the money was Mary Shaw's and $200 00 was Edmond Shaw's. I had given Edmond Shaw $100 00 of his money before I paid her the interest on the $500 00 to July 1st, 1864. On February 1st, 1863, I got $200 00 from Atkinson for Edmond Shaw, and settled with him in full, and I came to Judge McLaws and he drew the paper. I did not pay any more interest to Mary Shaw, but told her how her money was lost, and I went with her to Atkinson for the money in the fall of 1865, and she agreed to call on

him for the interest, and not to pester me any more, and he agreed to it. In 1868 Mr. Miller wrote me a note about it, and I went to see him and told him all about it, and showed him the note. He told me that the note ought to be sued in Clarke county, where Atkinson was living. I gave him up the note to do what was best, and paid him $15 00. Afterwards, Mr. Miller gave this paper. (See Exhibit A.) Afterwards, in 1872, Mr. Miller sent for me and got me to pay him $11 50, the costs of the case. He told me that if this money lent to Atkinson was Mary Shaw's money, I could not be held responsible. I never returned the note for taxation after 1864. Refused to deliver the note to Mary Shaw in 1865, because Judge McLaws advised me I could not do it until she married. I put this in bank to my own account, and received a notice, as indorser, when it was not paid. Mary Shaw never received any interest from Atkinson.

The defendant then introduced the following receipt:

(EXHIBIT A.)

"ATHENS, GA., February 4, 1868.

"Received of Thomas Wylds, of Augusta, Georgia, for collection, a note, a copy of which is hereto appended, upon the following terms: ten per cent.

Signed "L. & H. COBB, Attorneys at Law."

(COPY.)

"$700. AUGUSTA, GA., January 7, 1861.

"Thirty days after date I promise to pay to the order of A. R. Wright seven hundred dollars, at either bank in this city. Value received.

(Signed) "SIMEON A ATKINSON,
Indorsed: "A. R. WRIGHT."

"Received on the within, two hundred dollars. February 1, 1863."

Then the *fi. fa.* from Clarke superior court against Atkinson and Wright, on judgment rendered on the note February 11, 1870, no return of *nulla bona* appearing upon the *fi. fa.*

WILLIAM R. McLAWS testified as follows: I wrote the will of Charlotte Bugg, and was the adviser of Thomas Wylds, the executor under the will. Some time just before the war, or in the year 1861, he consulted with me about loaning out the money bequeathed to Mary Shaw, and asked me if General A. R. Wright, then Colonel Wright, was good security. I told him that he was; that I knew him well in Jefferson county, where he resided, and that he was reputed to be a man of large wealth. I was frequently consulted by Mr. Wylds about the matter. The receipt produced, being the final settlement with Mary Shaw, is in my hand-writing.

WILLIAM GIBSON testified as follows: Remember being consulted by Mr. Wylds when he was loaning the money to Mr. Atkinson as to the responsibility of Colonel Wright; told him that Colonel Wright was perfectly responsible. Colonel Wright was reputed to be worth $100,000. Witness did not know where the money was loaned. I indorsed for Atkinson in 1861, and was sued and compelled to pay it in 1863.

FRANK H. MILLER testified as follows: In the fall of 1867 I received an order from Mary E. Shaw to collect from Thomas Wylds the interest due her on the legacy under the will of Charlotte Bugg. I communicated the fact to Mr. Wylds, and asked a settlement. He produced a note of S. A. Atkinson for $700 00, dated January 7, 1861, at thirty days, indorsed by A. R. Wright, the balance due on which he stated represented the money he held as trustee for Mary Shaw. I asked him why he had not proceeded to collect it? He stated he had tried but failed; I then asked him why he had not sued it? He replied that he did not know that it was necessary. I replied that if he tried by a suit and failed it was the best evidence that was required as to his desire to do his duty. He asked me then to undertake the matter for him; I declined to take charge of it, but offered to prepare the writ so that Atkinson could be held to bail, and the indorser bound, and forward it to a responsible attorney in Clarke county, where Atkinson resided, who would act for him, to which he expressed himself satisfied, and left the note with

me. I prepared the writ returnable to August term, 1868, of Clarke superior court, obtained Wright's acknowledgment of service, as indorser, had him, as indorser, make affidavit to hold his principal to bail, and sent it, January 31, 1868, to L. & H. Cobb, attorneys, in Athens, Georgia. In my letter I requested the Messrs. Cobb to sign the writ, take the case as their own, and send a receipt for the note, to be delivered to Mr. Wylds. For this service Mr. Wylds paid me $15 00, January 31, 1868. The receipt for him was returned to me in letter of February 4th, 1868, and delivered to Mr. Wylds, who has since retained it. I told him I would wait to see the result of the suit, and did wait until compelled to sue to avoid the statute of limitations of 1869. I was informed by the Messrs. Cobb that the suit did not go to judgment until February, 1870, because not sooner reached, and in April, 1872, they returned me the *fi. fa.*, stating that no property of Atkinson could be found, and asked me to collect from Mr. Wylds their fee, and the costs due the officers of court. I informed Mr. Wylds of this matter, delivered him the *fi. fa.* July 23d, 1872, and received the costs due the clerk and sheriff, which I remitted that day, but he did not pay the Messrs. Cobb any fee. I never stated to him that if the money lent Atkinson was Mary Shaw's he could not be held responsible. I have said to him repeatedly if he could satisfy a jury that the money loaned to Atkinson was that held for Mary Shaw's benefit, and that he had used due and proper diligence to collect it, upon the non-payment of the note at maturity, he could not be held responsible. During this time I was the attorney of Mary Shaw.

Plaintiff, in rebuttal, offered the testimony of Philip L. Cohen, as follows: I do not know of General Wright's affairs previously, but he was solvent from 1868 to 1870. The money could have been made out of him during that period. Am son-in-law and administrator of A. R. Wright. His estate is embarassed, and believed to be insolvent. Never heard of this debt until yesterday.

The jury found for the plaintiff.

The defendants moved for a new trial, because the verdict was contrary to the evidence. The motion was sustained and the plaintiff excepted.

FRANK H. MILLER, by R. H. CLARK, for plaintiff in error.

McLAWS & GANAHL, for defendant.

TRIPPE, Judge.

The verdict of the jury was what the evidence required. The trustee seems to have done nothing for several years towards collecting the claim that was in his hands, the note for the money he had loaned. He never instituted suit on the note until the counsel for defendant in error caused him so to do, and then after the judgment was obtained nothing further was done with it. There is no entry on it, and it may be added there is in the record no satisfactory proof but that it might have been collected at any time. It certainly could up to 1870, and the only proof to the contrary since that time is that the estate of the indorser is embarrassed, and believed to be insolvent. That might well be, and yet a judgment obtained three years before the indorser's death be perfectly good. The trustee doubtless relied on what he said was an understanding with the young lady, that she was "not to pester him any more for the interest, but was to call on the borrower for it." How could she do this, with the note in the trustee's possession, and he refusing to let her have it? A trustee cannot thus discharge himself from his duty to make the proper effort to collect trust funds which he has loaned. He has accepted the trust, received the property, the law grants him compensation, and it would be unjust to allow him to reply to a female *cestui que trust*, just after she has reached her majority, that she must make her own collections, and that she agreed so to do. And this, too, to be the collecting of the interest due on a note which is in his hands, and the borrower residing one hundred miles off. We are

satisfied the verdict is right, is what it ought to have been, and that a new trial should have been granted had it been otherwise.

Judgment reversed.